**HEB GROCERY COMPANY, L.L.P., Appellant,**

v.

**Lisa FARENIK and Wayne Farenik, Appellee.**

No. 04–07–00349–CV.

Court of Appeals of Texas, San Antonio.

Oct. 3, 2007.

Sharon E. Callaway, Rebecca S. Smith, Crofts & Callaway, P.C., Harold J. Lotz, Jr., Daryl R. Hayes, Lotz & Associates, L.L.P., San Antonio, TX, for appellant.

Kimberly S. Keller, The Keller Law Firm, San Antonio, TX, William O. Whitehurst, Eugene W. Brees, II, Michelle M. Cheng, Whitehurst, Harkness, Ozmun & Brees, P.C., Austin, TX, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

In the underlying pharmacy malpractice case, HEB Grocery Company, L.L.P.

("HEB") challenged the expert reports filed by Lisa Farenik and Wayne Farenik and moved to dismiss the case. The trial court denied HEB's motion to dismiss, and this interlocutory appeal ensued. We affirm.

## BACKGROUND

The parties stipulated that HEB pharmacist, Lori Lynn Smith, incorrectly filled Lisa Farenik's prescription. Instead of providing Lisa with the correct prescription for Klonopin, an anti-anxiety medication, Smith gave her Clonidine, an anti-hypertensive drug designed to lower blood pressure. During the five days in which Lisa took the Clonidine, she experienced blurred vision and dizziness, symptoms commonly associated with hypotension. Eventually, Lisa suffered permanent vision loss and is now legally blind.

The Fareniks sued HEB, contending its negligence in dispensing Clonidine constituted the proximate cause of Lisa's injuries. HEB stipulated that its pharmacist breached the standard of care by dispensing Clonidine instead of Klonopin; however, HEB specifically reserved its right to argue that the conduct of other persons was the proximate cause of Lisa's injuries. Although not a stipulation, it is undisputed that Lisa exceeded the recommended dosage by taking the prescribed 0.1 mg of the drug at least four times per day, instead of the prescribed 0.1 mg two times per day.

The Fareniks served HEB with two expert reports, which the trial court determined were insufficient. In an attempt to cure the deficiencies, the Fareniks served HEB with an addendum to the report of only one of the experts, Dr. John E. Carter. The Fareniks did not attempt to cure the deficiencies in the report of the other expert. HEB again challenged Carter's report, alleging among other complaints, that Carter's report failed to provide a sufficient opinion on causation. The trial court denied HEB's motion to dismiss. On appeal, the sole issue is whether Carter's expert report constitutes a "good faith effort" to fairly summarize the causal relationship between HEB's negligence and Lisa's injuries.[2] We believe that it does.

## EXPERT REPORT

■ A plaintiff who brings a health care liability claim is required to file an expert report that contains "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006); *see Tovar v. Methodist Healthcare Sys. of San Antonio*, 185 S.W.3d 65, 67 (Tex.App.-San Antonio 2005, pet. denied). The report serves a two-fold purpose: (1) to inform the defendant of the specific conduct the plaintiff has called into question, and (2) to provide a basis for the trial court to conclude the plaintiff's claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). If the report does not constitute a good faith effort to comply with the statutory requirements, then the trial court may dismiss the lawsuit. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b)(2).

---

2. HEB phrases its challenge to the sufficiency of Carter's report on causation by asserting (1) he did not link the dosage prescribed by HEB to Lisa's injuries; (2) to the extent Carter attempted to connect dosage to harm, he did so only in broad terms suggesting nothing more than mere possibility; and (3) his report is based on Lisa's alleged, speculatory sensitivity to Clonidine. We consider all these arguments together.

In determining whether the expert report constitutes a good faith effort, we look no further than the report itself. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (the only information relevant to the inquiry is within "the four corners" of the report). The report need not marshal all of the plaintiff's proof, however, it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Id.* at 878; *Tovar,* 185 S.W.3d at 68. A plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. The report can be informal in that the information in the report does not have to meet the same requirement as the evidence offered in a summary judgment proceeding or at trial. *Id.* On the other hand, "it is not enough that the expert report 'provided insight' about the plaintiff's claims. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios's* two-part test." *Bowie Mem'l Hosp.,* 79 S.W.3d at 52 (citation omitted). The expert must explain the basis of his statements to link his conclusions to the facts. *Id.*

In the addendum to Carter's initial report, he states as follows:

> [Lisa] had normal blood pressure, actually at the lower end of normal. (According to Dr. Shaw's chart, her blood pressure was 110/60 on 5/6/04 and it was 104/64 on 1/7/05, before she took any Clonidine).... She reportedly used 21 pills, .1 mg each, from 1/7/05 until 1/12/05, which is a significant dose for a normotensive patient and is enough of a dose to cause significant hypotension in such a patient. She experienced symptoms attributable to systemic hypotension (dizziness, blurred vision, and mental status changes).

> She was given Clonidine and experienced symptoms attributable to systemic hypotension. Given her individual blood pressure this could have been the "normal" response to Clonidine with lowering of her [blood pressure] potentially as low as 86/46. This is certainly a level at which most individuals would experience symptoms and, if sustained, would be at risk for actual ischemic infarction. Alternatively, or more likely additionally, she may be one of the patients who is more sensitive to the drug, which would accentuate her response and the resulting adverse reaction. Her symptoms were characteristic and typical of hypotension and were temporally related to the use of Clonidine. The dose was sufficient to cause symptomatic hypotension and maintain it for the duration of its digestion. The degree of hypotension was sufficient and prolonged enough to produce ischemic injury to the visual areas of the brain....

> ...

> Medically speaking, it is clear that [Lisa] experienced a sustained hypotensive event caused by the Clonidine that produced damage to her visual cortical areas and left her legally blind. Legally speaking, the best medical probability is the same.

> ...

> ... Studies of Clonidine in humans demonstrate both a reduction in cardiac output (the amount of blood pumped by the heart) and a decrease in peripheral vascular resistance when the drug is started. The expected result is a reduction in blood pressure. This effect begins with the first dose of the medication; no build-up of the drug in the body is necessary for a response and a lowered blood pressure. With continued use, the cardiac output returns to baseline but the diminished peripheral resistance re-

mains so a beneficial effect on blood pressure is maintained in patients being treated for hypotension. Nevertheless, early on blood flow from the heart is decreased, which may serve to amplify any adverse impact of hypotension in a case like [Lisa's].

The recommended starting dose of Clonidine is .1 mg twice a day. [Lisa] evidently took a dose that was double the recommended dose (an average of .1 mg four times a day).

. . .

. . . [Lisa's] blood pressure was known to have run around 104–110 systolic and 60–64 diastolic prior to her taking the Clonidine. Although it was not measured, it would be reasonable to think that her blood pressure went to 90/50 (110–22 = 90 over 60–10=50 and I'm being conservative since in normal the average drop in diastolic was actually 18), a very low blood pressure and since cardiac output is also affected when an individual first starts taking the drug, her heart's output of blood was probably diminished as well. More importantly in my mind is the fact that some patients are more sensitive and have the side effects described above, including more severe, symptomatic hypotension, decreased cardiac output, and lowered heart rate. [Lisa] is one of those patients. . . . If someone who is more sensitive to the drug starts with a blood pressure at the low end of normal then the effects could be and in [Lisa's] case I believe were profound. . . . .

[Lisa] was unfortunate enough to be one of these sensitive patients with a low-normal blood pressure who was exposed to a powerful antihypertensive medication, suffered major vascular hypotension resulting in inadequate blood flow to the brain and damage to the cortical visual system as described in my initial report.

. . . Again, taking the average drop from the pharmacological studies and applying it to [Lisa's] established blood pressure, she could have had a pressure as low as 82/46. That level would certainly put her at risk and would be dangerously low. For better or worse we can't know what her blood pressure was. We know hers was generally low to start with. We know she had symptoms of hypotension. We know that she was taking this medicine for the first time and that means that her cardiac output was also decreased, which adds to the problem [of] poor blood flow. And we know that this low blood pressure was sustained for a period of days. Anyone would be at risk in this setting. Almost anyone would experience some symptoms in this setting. Some patients would experience some permanent complications from this event. [Lisa] was one of those.

. . .

How did this work in [Lisa's] case?

— [Lisa] inadvertently took a medication that she had not been taking before.

— She developed symptoms that evening that continued and worsened.

. . .

. . . When I saw [Lisa] initially I did not know what the dose of Clonidine she took was and I did not investigate because it was not necessary. Medically speaking the answer was clear. She was given a prescription for a medicine and she took it. The medication was meant to lower blood pressure and, based on her symptoms it did just that. Because she took it for several days, the state of hypotension was maintained for a prolonged period of time and resulted in permanent visual loss. The main

question was at what site in the visual system did the damage occur, was there anything else still going on that could influence this, and what was the long-term prognosis. Medically speaking, the dose for [Lisa] was enough to cause these events. She could easily have had the same outcome if she had taken half as much. Another individual with different metabolism or different sensitivity to the drug might have gotten away without permanent damage from this event.

HEB contends Carter's report improperly focused on the dosage taken by Lisa, rather than the dosage prescribed; therefore, his report is inadequate because (1) it does not connect Lisa's injuries to HEB's negligence in prescribing the wrong drug; and (2) it does no more than merely speculate that had Lisa taken the correct prescribed dosage, she still would have been injured. HEB argues that merely dispensing the wrong drug does not establish a causal link, and any causal link established by Carter exists only in a general sense of how a substance may cause a reaction in the general population, and not in the specific sense of how a substance caused a particular individual's injury. According to HEB, Carter's report, to be adequate, had to link the dosage actually prescribed—not the dosage actually ingested—with Lisa's injuries. HEB argues that the report's only attempt to provide this specific link is contained in a single sentence in which Carter states that Lisa "could easily have had the same outcome if she had taken half as much [of the dosage]."

We disagree with HEB's characterization of Carter's report. The Fareniks were not required to present evidence in the report as if they were actually litigating the merits of the case. For this reason, we reject HEB's argument that the Farenik's were required to counter HEB's defensive position that Lisa's own actions caused her injuries.[3] Instead, the Fareniks were required to provide an expert report, or reports, that linked HEB's negligent dispensing of the wrong drug with Lisa's injuries. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.) ("[C]ausation is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred."). We conclude Carter's report did just that. Carter acknowledges Lisa exceeded the recommended dosage, but he notes three times in his report that the effects of Clonidine are felt immediately ("when the drug is started"; "This effect begins with the first dose of the medication"; "when an individual first starts taking the drug"); he states that "no build-up of the drug in the body is necessary for a response and a lowered blood pressure"; he states Lisa developed symptoms "that evening"; and he states that a lowered blood pressure for a pro-

---

**3.** On appeal, HEB relies on *Borg–Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007) for its argument that dosage is "the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Id.* at 770–771. We note that *Borg–Warner* was not a case in which the trial court was required to make a pretrial determination on whether an expert report was sufficient to inform the defendant of the specific conduct the plaintiff had called into question and to provide a basis for the trial court to conclude the plaintiff's claims had merit. The case did not involve a claim against a health-care provider. Instead, the appeal arose from a fully-litigated trial on the merits, in which the plaintiff sued Borg–Warner and others alleging he suffered from asbestosis caused by working with brake pads (containing chrysotile asbestos fibers) for more than three decades.

longed period of time results in permanent visual loss. Carter also asserts Lisa would have sustained the same injuries even "if she had taken half as much." This conclusion is supported by Carter's contention that Clonidine is prescribed to lower blood pressure, a lowered blood pressure can lead to injury to the cortical visual system, and such an injury may cause loss of eyesight. Carter's report does more than merely "provide insight." He states unequivocally that "[m]edically speaking, it is clear that [Lisa] experienced a sustained hypotensive event caused by the Clonidine that produced damage to her visual cortical areas and left her legally blind. Legally speaking, the best medical probability is the same." On this record, we conclude it was reasonable for the trial court to conclude that Carter's report sufficiently informs HEB of the specific conduct the Fareniks have called into question and provides a basis for the trial court to conclude that the Fareniks' claims have merit.

## CONCLUSION

We believe the trial court did not act in an arbitrary or unreasonable manner, without reference to guiding rules or principles, when it determined Carter's report provided a fair summary on the issue of causation. Therefore, we affirm the trial court's order.