RANDOL MILL PHARMACY; KVG Enterprises, Inc.; Gary G. Daley; John Wayne Bailey; James Robert Forsythe; Kevin Lynn Heide; Julie Knowlton Lubbert; and Cara Morrell, Appellants

v.

Stacey MILLER and Randy Miller, Appellees.

No. 02–12–00519–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 19, 2013.

Rehearing and Rehearing En Banc Overruled Nov. 7, 2013.

Erin E. Lunceford, Michelle Quattlebaum, Sprott, Rigby, Newsom, Robbins & Lunceford, P.C., Houston, for Appellants.

Michael W. Minton, The Law Offices of Michael W. Minton, P.L.L.C., Fort Worth,

Greg Fitzgerald, Law Offices of Greg Fitzgerald, Bedford, for Appellees.

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

The primary issue we address in this appeal is whether a pharmacist's act—of filling a bulk phone order placed by a doctor for over twenty 30–milliliter vials of an injectable form of the antioxidant supplement lipoic acid for use in the doctor's office—constitutes dispensing a prescription medicine as required for the pharmacist to qualify as a health care provider under the Texas Medical Liability Act (TMLA). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(12)(A)(iv), (22) (West Supp.2012). Because we hold that the answer to this question is no, we will affirm the trial court's order denying Appellants'[1] motion seeking dismissal of Appellees Stacey Miller and Randy Miller's suit based on the failure to file a chapter 74 expert report. *See id.* § 74.351 (West 2011).

### II. FACTUAL AND PROCEDURAL BACKGROUND

Stacey was diagnosed with Hepatitis C. To treat Stacey's previously diagnosed Hepatitis C, Dr. Ricardo B. Tan began administering weekly injections of the antioxidant supplement lipoic acid. After nine weeks of treatment, Stacey began an episode of violent nausea and vomiting when Dr. Tan administered an injection of lipoic acid to Stacey on December 5, 2011. She was transported to the hospital where, according to her pleadings, she experienced "violent nausea, vomiting, tachycar-

---

1. Appellants are Randol Mill Pharmacy; KVG Enterprises, Inc.; Gary G. Daley; John Wayne Bailey; James Robert Forsythe; Kevin Lynn Heide; Julie Knowlton Lubbert; and Cara Morrell.

dia, severe back pain, neck and body pain, abdominal pain, diarrhea, a hematemesis/UGI bleed, acidosis, elevated CPK, electrolyte abnormality, fever, irritability, confusion, lethargy, muscle weakness, blurry vision with dark spots, hemorrhages in both eyes, right pleural effusion, hypotension, enlarged spleen, fluid in her gallbladder with surrounding fluids, a large amount of upper ABD ascites, periportal edema, and diverticulosis." Stacey was hospitalized for several weeks and underwent multiple blood transfusions. As a result of this episode, she was rendered blind in both eyes.

Stacey and her husband Randy filed suit against Appellants alleging that Appellants had manufactured, distributed, and sold a defective product—injectable lipoic acid; failed to give physicians, as learned intermediaries, adequate and proper warning with respect to the risks associated with the use of lipoic acid; and breached implied warranties in the design, manufacture, inspection, marketing, and distribution of lipoic acid because it was not reasonably suited for the purposes and use for which it was intended and was not of merchantable quality. The Millers did not file an expert report under the TMLA. Appellants filed a motion to dismiss, claiming that the Millers' suit against them was a health care liability claim governed by the TMLA. The Millers filed a response, attaching numerous documents generated through the investigation launched by the Texas Department of State Health Services (TDSHS) concerning Appellants' manufacture of the injectable lipoic acid and Stacey's injuries. After a hearing, the trial court signed an order denying Appellants' motion to dismiss; Appellants perfected this appeal.

### III. STANDARD OF REVIEW AND RULES OF STATUTORY CONSTRUCTION

The question of whether a cause of action is a health care liability claim under the TMLA is one of law, which we review de novo. *See Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex.2012). When construing a statute like the TMLA, our primary objective is to ascertain and give effect to the legislature's intent. Tex. Gov't Code Ann. § 312.005 (West 2013); *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.2011); *see Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 176 (Tex.2004). To discern that intent, we begin with the statute's words. Tex. Gov't Code Ann. § 312.002 (West 2013); *see Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex.2004). If a statute uses a term with a particular meaning or assigns a particular meaning to a term, we are bound by the statutory usage. *TGS–NOPEC*, 340 S.W.3d at 439; *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex.2002). Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *TGS–NOPEC*, 340 S.W.3d at 439; *In re Hall*, 286 S.W.3d 925, 928–29 (Tex.2009) (orig. proceeding). Words and phrases shall be read in context and construed according to the rules of grammar and common usage, but words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly. Tex. Gov't Code Ann. § 311.011 (West 2013). We presume that the legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex.2010); *In re M.N.*, 262 S.W.3d 799, 802 (Tex.2008); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex.App.-Austin 2010, no pet.). We also presume that the legisla-

ture was aware of the background law and acted with reference to it. *See Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990).

## IV. APPELLANTS DO NOT MEET THE TMLA'S DEFINITION OF PHARMACIST, SO APPELLANTS ARE NOT HEALTH CARE PROVIDERS

The TMLA defines a health care liability claim as

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(13). According to this definition, a health care liability claim has three elements: (1) the defendant is a health care provider or physician; (2) the claimant's cause of action is for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's alleged departure from accepted standards proximately caused the claimant's injury or death. *Loaisiga v. Cerda,* 379 S.W.3d 248, 255 (Tex.2012); *see Marks v. St. Luke's Episcopal Hosp.,* 319 S.W.3d 658, 662 (Tex.2010) (plurality opinion).

The first element is at issue here. The definition of a health care provider includes a pharmacist. Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(12)(A)(iv), (22).

Under the TMLA, a pharmacist is then further, more narrowly defined as

one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities limited to the dispensing of prescription medicines which result in health care liability claims and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

*Id.* § 74.001(a)(22).

The Millers attached numerous documents to their response to Appellants' motion to dismiss. The documents attached to the Millers' response to Appellants' motion to dismiss contain the information set forth below: [2]

- Injectable lipoic acid has not been granted marketing approval pursuant to a U.S. Food and Drug Administration New Drug Application or Abbreviated New Drug Application nor is it exempt from this requirement.

- Dr. Tan placed a "bulk" telephone order with Appellants on November 29, 2011 and on December 2, 2011 for an aggregate of twenty-three 30–milliliter vials of injectable lipoic acid for "office use."

- Dr. Tan did not complete or call in a prescription for, nor did Appellants fill a prescription for, Stacey Miller or for any other specific individual user for injectable lipoic acid.

- Under Texas law, when a pharmacy distributes for office use and does not receive a prescription drug order for a specific patient, the pharmacy is "no longer exempt from being a manufacturer per Texas Food, Drug, and Cosmetic Act § 431.4014–a." [3]

---

2. Appellants did not assert any objection to the trial court's consideration of these documents in connection with the trial court's ruling on their motion to dismiss.

3. The Establishment Inspection Report issued

- Lipoic acid is compounded by mixing lipoic acid, sodium hydroxide, sterile water, and benzyl alcohol.

Appellants claim that they are health care providers and that, accordingly, the Millers were required to file an expert report under the TMLA. As set forth above, the TMLA's definition of a pharmacist is

> one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities *limited to the dispensing of prescription medicines which result in health care liability claims* and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

*Id.* (emphasis added). So, the question here is whether Appellants' compounding of an antioxidant supplement—injectable lipoic acid, Appellants' sale of that drug in bulk to a physician for office use to be injected into unknown users, and Appellants' sale of that drug in bulk in the absence of any prescription drug order for any specific person constitutes "dispensing prescription medicine" so that a pharmacist engaged in such activity is a health care provider under the TMLA.

Although the TMLA does not define the word "dispensing" that is used in its definition of a "pharmacist," chapter 551 of the Texas Occupations Code—known as the Texas Pharmacy Act—defines "dispense" to mean "to prepare, package, compound, or label, in the course

of professional practice, a prescription drug or device for delivery to an ultimate user or the user's agent under a practitioner's lawful order."[4] Tex. Occ.Code Ann. § 551.003(16) (West 2012). Applying the rules of statutory construction recited above, the definition of the term "dispense" in the Texas Pharmacy Act applies to the same term—"dispensing"—used in defining a pharmacist in the TMLA. *See* Tex. Gov't Code Ann. § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *Sheshunoff v. Sheshunoff,* 172 S.W.3d 686, 692 (Tex. App.-Austin 2005, pet. denied) (explaining that court should give same meaning to same terms used in other statutory provisions on same or similar subjects unless something indicates different meaning was intended); *Guthery v. Taylor,* 112 S.W.3d 715, 721–22 (Tex.App.-Houston [14th Dist.] 2003, no pet.) ("When the same or a similar term is used in the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended."); *Dickens v. Willis,* 957 S.W.2d 657, 659 (Tex.App.-Austin 1997, no pet.) (stating in absence of definition, court may look to similar area of law for guidance); *L & M–Surco Mfg., Inc. v. Winn Tile Co.,* 580 S.W.2d 920, 926 (Tex.Civ.App.-Tyler 1979, writ dism'd w.o.j.) ("Where the same or a similar term is used in the same connection in different statutes, it will be given

by the TDSHS summarizes, "There is no evidence the compounded drug [lipoic acid] was distributed pursuant to a prescription drug order from a practitioner for a specific patient; therefore [the pharmacy or establishment was] manufacturing new prescription drugs [and that drug, injectable lipoic acid] lacked evidence of approval by the Food and Drug Administration."

4. In fact, Appellants urge us to apply definitions—other than the definition of "dispense"—from the Texas Pharmacy Act in our construction of the definition of "pharmacist" set forth in the TMLA.

the same meaning in one that it has in another, unless there is something to indicate that a different meaning was intended. This rule applies with particular force where the meaning of a word as used in one act is clear or has been judicially determined, and the same word is subsequently used in another act pertaining to the same subject."); *see also* Tex. Occ. Code Ann. § .551.002 (West 2012) (explaining that legislative purpose of Texas Pharmacy Act is to regulate the practice of pharmacy). To hold otherwise would be to judicially rewrite the expressly limited definition of "pharmacist" set forth in the TMLA as one who is licensed and is "dispensing [ ] prescription medicines" to make it broader by including activities that the Texas Pharmacy Act does not define as "dispensing" and to judicially generate an unnecessary conflict between the actions constituting "dispensing" under the TMLA and the actions constituting "dispensing" under the Texas Pharmacy Act.

Utilizing the Texas Pharmacy Act's definition of "dispense," a pharmacist "dispenses" a drug when he or she prepares, packages, compounds, or labels in the course of professional practice a prescription drug or device for delivery to an ultimate user or the user's agent under a practitioner's lawful order. Tex. Occ.Code Ann. § 551.003(16). An "ultimate user" is defined in the Texas Pharmacy Act, in pertinent part, as a "person who obtains or possesses a prescription drug or device for the person's own use." *Id.* § 551.003(43).

■ Here, it is undisputed that Appellants did not compound the injectable lipoic acid for delivery to an ultimate user, i.e., for delivery to Stacey Miller or any other specific person. Appellants concede as much in their motion to dismiss and in their appellate brief, arguing that they compounded the injectable lipoic acid for delivery to Dr. Tan for his office use based on Dr. Tan's bulk phone order. Dr. Tan was not an ultimate user because he did not obtain the injectable lipoic acid to use on himself. *See id.* Consequently, as a matter of law, because Appellants did not compound the lipoic acid for delivery to an ultimate user, they were not "dispensing" a prescription drug. *See id.* § 551.003(16) (defining dispensing). Because Appellants were not "dispensing," as that term is defined in the Texas Pharmacy Act, they do not meet the limited definition of a "pharmacist" under the TMLA.[5] *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(22) (limiting definition of pharmacist to one dispensing prescription medication).

And because Appellants in this case do not fall within the TMLA's limited definition of "pharmacist," they are—by this limited definition—specifically excluded from the TMLA's statutory list of health care providers. *See id.* § 74.001(a)(12); *TGS–NOPEC*, 340 S.W.3d at 439 (explaining that if a statute assigns a particular meaning to a term—here "pharmacist"— we are bound by the statutory usage). Finally, because Appellants are not health care providers, the first element of a

---

**5.** We need not and do not decide whether lipoic acid is a prescription drug. If it is not, Appellants do not fall within the TMLA's definition of "pharmacist" because only a pharmacist dispensing *prescription* medications falls within the TMLA's definition of "pharmacist," and if it is—as Appellants contend— then Appellants still do not fall within the TMLA's definition of "pharmacist" because,

as analyzed above, under the facts presented here they were not "dispensing" as the act of dispensing requires the existence of a practitioner's lawful order of the prescription drug for a specific person's use. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(22) (defining pharmacist); Tex. Occ.Code Ann. § 551.003(16), (43) (defining dispensing and ultimate user, respectively).

health care liability claim does not exist.[6] *See Loaisiga,* 379 S.W.3d at 255 (setting forth elements of health care liability claim). Therefore, the Millers were not required to file an expert report under the TMLA, and the trial court did not err by denying Appellants' motion to dismiss. We overrule Appellants' sole issue.[7]

## V. RESPONSE TO THE DISSENTING OPINION

The dissenting opinion muddles the issues[8] and misunderstands our holding. The dissenting opinion states:

> The majority's interpretation would deny the many pharmacists who *compound drugs for individuals* that must be administered by nurses or physicians, intravenously or otherwise, of the protections afforded to them by the TMLA simply because the pharmacist did not personally *deliver the prescription to the recipient.*

Dissenting Op. at 854 (emphasis added). And further states:

6. The cases cited by Appellants are inapposite. The cases cited by Appellants do not involve the first element of a health care liability claim—whether the defendant is a health care provider; instead, they involve the second prong—whether the claimant's cause of action is for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care. *See, e.g., Ruiz v. Walgreen Co.,* 79 S.W.3d 235, 238 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (addressing whether, under prior version of the TMLA, plaintiffs' pleading stated a medical malpractice claim).

7. Having overruled Appellants' sole issue on the ground that Appellants in this case are not health care providers under the TMLA, we need not address Appellants' other arguments concerning the nature of the Millers' claims; if Appellants are not health care providers, the Millers' claims are not health care liability claims. *See, e.g., Boulder Creek Acad. v. Kline,*

According to the majority's interpretation, the difference between holding a pharmacist liable under the TMLA or ordinary tort law could be whether a nurse or physician administered the drug as opposed to the pharmacist directly *delivering the prescription to the patient.*

*Id.* at 17 (emphasis added). These statements in the dissenting opinion are wrong. Under our analysis set forth above, a pharmacist who is *compounding prescription drugs for individuals* does fall within the TMLA's statutory definition of a pharmacist. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(22) (defining pharmacist as "one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities limited to the dispensing of prescription medicines"); Tex. Occ.Code Ann. § 551.003(16) (defining "dispens[ing]" as "prepar[ing], packag[ing], compound[ing], or label[ing] in the course of professional practice, a prescription drug or device for delivery to

392 S.W.3d 752, 755 (Tex.App.-Dallas 2012, no pet.) (holding that because the defendant did not qualify as a health care provider, the plaintiffs' claim was not a health care liability claim).

8. For example, the dissenting opinion notes that a pharmacist may compound a "drug" (defined differently than a "prescription drug") for a practitioner's office use, but it fails to recognize that the TMLA's definition of "pharmacist" applies only to pharmacists who are dispensing or compounding *prescription* drugs and that a prescription drug by definition requires a *prescription,* that is, a practitioner's lawful order of the prescription drug for a specific person's use. *See* Tex. Occ.Code Ann. § 562.152 (authorizing delivery of compounded drug—but not prescription drug—to practitioner for office use); Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(22) (defining pharmacist); Tex. Occ.Code Ann. § 551.003(16), (18), (36), (43) (defining dispensing, drug, prescription drug, and ultimate user, respectively).

an ultimate user or the user's agent under a practitioner's lawful order"); *id.* § 551.003(43) (defining "ultimate user" as a "person who obtains or possesses a prescription drug or device for the person's own use"). A pharmacist's delivery of an injectable prescription drug to an "ultimate user's agent," i.e., to the doctor or nurse for administration to the specific person for whom the injectable drug was prescribed, does not exclude the pharmacist from the TMLA's definition of "pharmacist," and our opinion nowhere holds otherwise. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(22); Tex. Occ.Code Ann. § 551.003(16), (43). Our holding is that Appellants here fail to meet the TMLA's definition of pharmacist because the record before us conclusively establishes—in fact Appellants concede [9]—that they were not dispensing (or compounding) lipoic acid pursuant to a practitioner's lawful order for any specific person, for any individual, or for any identifiable patient. They were filling a bulk phone order by Dr. Tan for his office use.

The dissenting opinion would hold—contrary to the controlling statutory definitions—that a pharmacist falls within the TMLA's definition of pharmacist when he or she fills a telephone order for large quantities of a prescription drug for office-use administration to persons to be determined at a later date. *Cf.* Tex. Occ.Code Ann. § 551.003(16), (43); *see also* 21 C.F.R. § 1306.04(b) (2005) (specifically prohibiting a pharmacist from filling a bulk order for a controlled substance for office use by the doctor by providing that "[a]

prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients"); Tex. Health & Safety Code Ann. § 481.002(41) (West 2010) (defining "prescription" as "an order by a practitioner to a pharmacist for a controlled substance *for a particular patient*") (emphasis added). Appellants did not compound the lipoic acid pursuant to a prescription for Stacey or for delivery to Stacey—the ultimate user. *See* Tex. Occ. Code Ann. § 551.003(16), (43). Because the lipoic acid was ordered in bulk, not prescribed for any particular person, Appellants could not be compounding the lipoic acid for any particular person, and Dr. Tan cannot be the "agent" of some yet to be determined user. *See id.* § 551.003(16), (43). Appellants fail to meet the TMLA's definition of pharmacist either because (if lipoic acid is a prescription drug) they were not dispensing lipoic acid pursuant to a practitioner's lawful order of the drug for any specific person or because (if lipoic acid is not a prescription drug) only pharmacists who, for the purposes of the TMLA are performing "those activities limited to the dispensing of *prescription* medicines" fall within the TMLA's definition of "pharmacist." *See* Tex. Occ.Code Ann. § 551.003(16), (43); Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(22).

The dissenting opinion contains nice policy arguments, a good legislative history of the TMLA, and lots of cases claiming to explain current trends in the interpreta-

---

9. During oral argument, the first question asked of Appellants' counsel was, "This [lipoic acid] was prepared for Dr. Tan, it wasn't prepared specifically for the plaintiff?" Appellants' counsel answered, "That is true." Later, counsel was asked, "The record, it sounds like at least, does not contain a written prescription, but there was a telephonic order from the doctor's office to the pharma-

cy." And she responded, "Absolutely." She was asked, "And was that telephone order in bulk for his patients or was it specifically stated that it was addressed for these plaintiffs or this plaintiff?" She answered, "No, it was for office use. They had provided it in the past. He administers it to a number of patients."

tion of the TMLA concerning elements of health care liability claims other than the one at issue here—whether Appellants meet the definition of a health care provider. We do not disagree with any of this generic information set forth in the dissenting opinion. But it contributes nothing to the required statutory construction analysis. As set forth above, applying the relevant statutory definitions in this case— as we must—under these facts Appellants do not meet the TMLA's definition of pharmacist. *See TGS–NOPEC*, 340 S.W.3d at 439; *Needham*, 82 S.W.3d at 318.

### VI. CONCLUSION

Having overruled Appellants' sole issue, we affirm the trial court's order denying Appellants' motion to dismiss.

LIVINGSTON, C.J., filed a dissenting opinion.

### DISSENTING OPINION

TERRIE LIVINGSTON, Chief Justice.

I respectfully dissent from the majority's opinion because I believe that the claims urged by Stacey and Randy Miller are health care liability claims that require an expert's report under chapter 74. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011). I further believe that the majority adopts an overly strict interpretation of the Texas Medical Liability Act (TMLA) that both unnecessarily heightens the already rigorous statutory requirements pertaining to pharmacists and runs contrary to the trend of case law interpreting the TMLA.

The Texas Legislature, hoping to curtail the number of frivolous lawsuits and preemptively remedy an impending rise in health care costs, intensified the procedural requirements necessary to sustain a cause of action against a health care pro-

vider when it passed the TMLA. *See Scoresby v. Santillan*, 346 S.W.3d 546, 553–54 (Tex.2011) ("Fundamentally, the goal of the [TMLA] has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims."). The statutory and procedural rigor of the TMLA ought to serve largely to *deter* frivolous lawsuits regarding health care, rather than compel or even encourage litigants to disguise health care liability claims and divert them into other areas of the law. *See id.* Although the TMLA heightened the procedural threshold for health care liability claims, it did not alter the substantive or underlying nature of these claims. *Omaha Healthcare Ctr., L.L.C. v. Johnson*, 344 S.W.3d 392, 394–95 (Tex.2011) ("In order to determine whether a claim is [a health care liability claim], we consider the underlying nature of the claim. Artful pleading cannot alter that nature." (citation omitted)).

### The TMLA's Text

The TMLA provides that a health care liability claim is

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant.

Tex. Civ. Prac. & Rem.Code Ann. § 74.001(13) (West Supp.2012). The TMLA supplies a general definition for a "[h]ealth care provider" that includes a pharmacist and any employee, independent contractor, or agent of a pharmacist acting "in the course and scope of the employment or contractual relationship." *Id.* § 74.001(12)(A)(iv), (B)(ii). Additionally, the TMLA generally defines "[h]ealth

care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(10). Despite these broad definitions, however, the TMLA significantly limits the scope of possible health care liability claims against pharmacists in a separate provision providing,

> "Pharmacist" means one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities limited to the dispensing of prescription medicines which result in health care liability claims and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

*Id.* § 74.001(22). Therefore, according to this stricter standard, a health care liability claim may be sustained only against a pharmacist who dispenses prescription medications that result in a health care liability claim.

The issue here hinges on whether appellants qualify as "health care providers" under the TMLA, which requires that they satisfy the TMLA's criterion of "dispensing ... prescription medications." The Texas Pharmacy Act (TPA) provides a technical definition for the term "dispense" as it pertains to pharmacists:

> "Dispense" means to prepare, package, compound, or label, in the course of professional practice, a prescription drug or device for delivery to an ultimate user or the user's agent under a practitioner's lawful order.

Tex. Occ.Code Ann. § 551.003(16) (West 2012).

Both the majority and appellees contend that appellants do not satisfy the "pre-scription drug" aspect of the TPA's definition of "dispense" because appellants did not provide the lipoic acid to Dr. Tan pursuant to an individual prescription for Stacey Miller. *See id.* The standards for "pharmacist" under the TMLA and "dispense" under the TPA, however, require merely a "prescription drug," *not* a drug specifically prescribed for a particular individual. *Id;* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(22). Appellees rely heavily on the report of the Texas Department of State Health Services to support their claim that there was no prescription for a *specific* patient. This very report concedes, however, that appellants were compounding "*prescription drugs,* such as: Lipoic Acid Injectable 200 mg/ml." [Emphasis added.] Furthermore, in addition to labeling the lipoic acid injections as a "prescription drug," the report also includes a report from the pharmacy's records of the prescriptions provided to Dr. Tan, which lists the date and time that appellants delivered the lipoic acid injections, assigns each order a separate "Rx # ," and notes the specifications and instructions for the lipoic acid to be dispensed.

The majority states that "Dr. Tan placed a 'bulk' telephone order with appellants on November 29, 2011 and on December 2, 2011 for an aggregate of twenty-three 30–millimeter vials of injectable lipoic acid for 'office use.' " An orally transmitted prescription order may be valid, though, provided that the pharmacist notes "the dispensing instructions of the practitioner" and "retain[s] the prescription for the period specified by law." Tex. Occ.Code Ann. § 562.004 (West 2012). The pharmacy's report clearly indicates that the pharmacist to whom Dr. Tan transmitted his order noted Dr. Tan's specifications for 200 mg/ml lipoic acid injections. Lastly, there is no requirement that compounding be

performed strictly for an individual patient to be considered compounding rather than manufacturing. *See id.* §§ 562.152 ("A pharmacy may dispense and deliver a reasonable quantity of a compounded drug to a practitioner for office use by the practitioner in accordance with this chapter."), 551.003(23) (" 'Manufacturing' means the production, preparation, propagation, conversion, or processing of a drug or device.... The term *does not include compounding.*" (emphasis added)), 551.003(9)(B) (" 'Compounding' means the preparation, mixing, assembling, packaging, or labeling of a drug or device ... for administration to a patient by a practitioner as the result of a practitioner's initiative.") (West 2012). Therefore, even though the record does not contain an individual prescription for Stacey Miller, it does indicate that appellants compounded the lipoic acid injections pursuant to a prescription from Dr. Tan that is valid for TMLA purposes.

The second issue the majority raises regarding the definition of "dispense" concerns the phrase "delivery to an ultimate user." *Id.* § 551.003(16). The TPA defines "deliver" or "delivery" as "the actual, constructive, or attempted transfer of a prescription drug or device or controlled substance from one person to another, with or without consideration." *Id.* § 551.003(13). The TPA also defines an "ultimate user" as a "person who obtains or possesses a prescription drug or device for the person's own use or for the use of a member of the person's household." *Id.* § 551.003(43). The majority rests its ruling on these two definitions; however, other statutes provide further relevant guidance regarding the meaning of "dispense." For instance, the health and safety code also defines "dispense" in the context of regulating pharmaceutical practice; it provides,

"Dispense" means the delivery of a controlled substance in the course of professional practice or research, by a practitioner or person acting under the lawful order of a practitioner, to an ultimate user or research subject. The term includes the prescribing, *administering,* packaging, labeling, or *compounding* necessary to prepare the substance for delivery.

Tex. Health & Safety Code Ann. § 481.002(12) (West 2010) (emphasis added). Therefore, according to this definition, the chain of events comprising dispensation would have included Dr. Tan's administering the lipoic acid to Stacey Miller as well as appellants' compounding of it. *See id.;* Tex. Occ.Code Ann. § 551.003(1) (defining "administer" as the direct application of a prescription drug to the body of a patient, including by injection).

The majority construes the definition of "ultimate user" too narrowly, asserting that appellants did not fulfill the standard because they delivered the compounded lipoic acid to Dr. Tan, who did not use the drug on himself. This construction unnecessarily increases the already heightened standard imposed by the legislature; nowhere does the TMLA dictate the strict privity between a pharmacist and an ultimate user that the majority suggests. The majority's interpretation would deny the many pharmacists who compound drugs for individuals that must be administered by nurses or physicians, intravenously or otherwise, of the protections afforded to them by the TMLA simply because the pharmacist did not personally deliver the prescription to the recipient. Despite the TPA's more limited definition under the health and safety code, the administration of a drug to an ultimate user by a physician constitutes sufficient "delivery" that satisfies the definition of "dispense."

Therefore, a plain text interpretation of the TMLA and related statutes reveals that appellees did in fact state a TMLA claim against appellants. The record supports that the lipoic acid injections were in fact a "prescription medicine," despite not being prescribed for a particular individual. Furthermore, administration by a physician is a valid method of "delivery," so construing Stacey Miller as the "ultimate user" is not impermissible under related statutory text, even though she did not administer the injections to herself. *See* Tex. Health & Safety Code Ann. § 481.002(12). Because the "prescription drug," injectable lipoic acid, was delivered to the "ultimate user," Stacey Miller, I believe this situation meets the TPA's definition of "dispense." *See* Tex. Occ.Code Ann. § 551.003(16). Therefore, since appellees essentially contend that appellants breached an accepted standard of health care when they compounded the lipoic acid and "dispens[ed] ... [the] prescription medicine[ ]," appellees state a claim under the TMLA that is subject to chapter 74's expert report requirements. *See id.; see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351.

The majority conflates two separate elements of the statutory definition of "dispense." Essentially, the majority states that for a pharmacist to qualify as a health care provider under the TMLA, the pharmacist must dispense a prescription drug pursuant to an individual prescription for a specific patient; however, this theory unduly heightens the already strict standard pharmacists must satisfy to qualify as health care providers under the TMLA. The definition of "dispense" contains multiple distinct requirements: a pharmacist must (1) prepare, compound, or label, (2) in the course of professional practice, (3) a prescription drug (4) for delivery to an ultimate user or the ultimate user's agent (5) under a practitioner's lawful order.

Tex. Occ.Code Ann. § 551.003(16) (defining "dispense"). The majority's interpretation construes the fourth and fifth requirements so as to create a more onerous requirement that a pharmacist may only prepare, compound, or package a prescription drug for an ultimate user pursuant to a practitioner's lawful prescription specifically for the ultimate user to satisfy the definition of "dispense." *Id.* The statute clearly states, however, that a pharmacist need only compound a prescription drug pursuant to a practitioner's lawful *order* to satisfy the definition of "dispense." *See id.* The occupations code includes a distinct definition of "prescription drug order," defining a prescription drug order as "an order from a practitioner ... to a pharmacist for a drug or device *to be dispensed.*" *Id.* § 551.003(37)(A) (emphasis added). This definition, too, does not require that a prescription drug order be an order from a practitioner to a pharmacist for a drug to be dispensed pursuant to a prescription for a specific patient. As stated above, Dr. Tan's telephonic order to appellants for lipoic acid qualifies as a "practitioner's lawful order" as it pertains to the definition of "dispense," even though Dr. Tan did not order the lipoic acid exclusively as a prescription for Stacey Miller.

Thus, the final remaining issue is whether the criterion that the drug is delivered to an "ultimate user's agent" is satisfied. The majority concedes that a doctor or nurse administering a drug could serve as an "ultimate user's agent"; however, they qualify this concession by stating that a doctor or nurse is an "ultimate user's agent" under the definition of "dispense" only if the doctor or nurse administers a drug prescribed specifically for the "ultimate user." This creates another ancillary requirement not included within the statute. The definition of "ultimate user" requires only that a person "obtain[ ] or

possess[ ] a prescription drug ... for the person's own use"; this definition does not require that the ultimate user do so as the result of a specific and unique prescription, and the definition of "dispense" requires only that the drug be delivered to the ultimate user under a practitioner's lawful order. *Id.* § 551.003(16), (43). The existence of a specific prescription does not alter the identity of the ultimate user or the nature of the agents who may administer the drug. Stacey Miller is the "ultimate user" of the prescription drug—lipoic acid—because she "obtain[ed]" and "possess[ed]" the prescription drug when her agent-Dr. Tan-delivered the drug to her by administering the injection. *Id.* § 551.003(43).

In sum, because the lipoic acid was compounded under Dr. Tan's lawful order and then delivered either actually to Stacey Miller's agent, Dr. Tan, or constructively to Stacey Miller herself by Dr. Tan, appellants did in fact "dispense" the lipoic acid, which qualifies them as health care providers under the TMLA. *Id.* §§ 551.003(13) (defining "delivery" as the "actual" or "constructive" transfer of a prescription drug), 551.003(16); Tex. Civ. Prac. & Rem. Code Ann. § 74.001(22).

**Interpretation of the TMLA**

The majority's interpretation also runs contrary to the case law interpreting the TMLA. In general, courts have construed the TMLA broadly, so as to include claims within the TMLA. *See, e.g., Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 853–54 (Tex.2005) (holding that patient's claim against health care provider for assault by another patient was health care liability claim); *Covenant Health Sys. v. Barnett,* 342 S.W.3d 226, 233–34 (Tex. App.-Amarillo 2011, no pet.) (holding that allegations of improper monitoring of patient at free heart screening test and placing of aerobic step for screening too close

to wall constituted health care liability claim); *Scientific Image Ctr. Mgmt., Inc. v. Brewer,* 282 S.W.3d 233, 239–40 (Tex. App.-Dallas 2009, pet. denied) (holding that plaintiff's claims couched as claims under the Texas Deceptive Trade Practices–Consumer Protection Act for failed elective plastic surgery were in essence health care liability claims governed by chapter 74); *Clark v. TIRR Rehab. Ctr.,* 227 S.W.3d 256, 262–64 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (holding that failure to supervise elderly woman attempting exercise during physical therapy was health care liability claim). This broad construction of the TMLA largely serves to further the legislature's intent that decisions requiring medical, health care, or otherwise professional judgment be weighed against accepted standards of professional care, thereby insulating medical and health care professionals from claims of ordinary negligence arising from the exercise of professional judgment. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.001(13) (defining health care liability claim as "a cause of action ... [for a] claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care"); *see also Clark,* 227 S.W.3d at 262–64; *Oak Park, Inc. v. Harrison,* 206 S.W.3d 133, 139 (Tex.App.-Eastland 2006, no pet.) (holding that allowing dangerous patient to remain in same room as another patient was governed by accepted standards of medical care, health care, and safety rather than by ordinary negligence).

The core rationale behind holding professionals to a professional standard of care and requiring a threshold expert report is that many of the elements of a medical negligence claim and the facts that underlie them transcend common knowledge. In most claims of medical negli-

gence, an expert would be required eventually to prove causation or damages, so the threshold expert report requirement in chapter 74 seeks to eliminate meritless or medically unsustainable claims before they progress to further stages of litigation. *See Saleh v. Hollinger,* 335 S.W.3d 368, 374 (Tex.App.-Dallas 2011, pet. denied) ("In determining whether a claim is inseparable from the rendition of medical care, we consider factors such as whether a specialized standard in the health care community applies to the alleged circumstances and whether the alleged negligent act involved medical judgment related to the patient's care or treatment.") (citing *Diversicare,* 185 S.W.3d at 847–52); *see also Inst. For Women's Health, P.L.L.C. v. Imad,* No. 04–05–00555–CV, 2006 WL 334013, at *3 (Tex.App.-San Antonio Feb.15, 2006, no pet.) (mem.op.) ("Expert testimony is necessary to establish the applicable standard of care 'when the alleged negligence is of such a nature as not to be within the experience of the layman.'" (quoting *FFE Transp. Serv., Inc. v. Fulgham,* 154 S.W.3d 84, 90 (Tex.2004)).

The majority's construction of the TMLA leads to a result directly at odds with the legislature's intent. Not only does the majority's interpretation deny appellants the statutory protection of measuring their professional judgment against an accepted standard of professional care, it also exposes appellants to greater liability by allowing appellees to couch an essentially health care based claim in terms of a product liability claim and circumvent the procedural standards of chapter 74. *See Omaha Healthcare Ctr., L.L.C.,* 344 S.W.3d at 394–95 (stating litigants cannot avoid the requirements of the TMLA by artfully pleading a health care liability claim and classifying the claim as a different cause of action).

Here, appellees allege their claims against appellants in terms of a products liability suit in which they assert that appellants compounded defective lipoic acid. Compounding is an integral aspect of the practice of pharmacy, however, such that it is part of the standard curriculum at most pharmacy schools. *See Med. Ctr. Pharm. v. Mukasey,* 536 F.3d 383, 387–88 (5th Cir.2008) (citing *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 361, 122 S.Ct. 1497, 1500, 152 L.Ed.2d 563 (2002)). Although a significant portion of the professional practice of pharmacy has lapsed into the process of packaging and distributing premeasured dosage units provided by large-scale manufacturers for retail sale and distribution, the localized service of compounding prescription drugs nevertheless continues to require a pharmacist's professional judgment and skill. *Compare Tex. State Bd. of Pharm. v. Gibson's Disc. Ctr., Inc.,* 541 S.W.2d 884, 888 (Tex.App.-Austin 1976, writ ref'd n.r.e.) ("[I]t is a fair conclusion that the dispensing of prescription drugs has become more of a retail endeavor than a service endeavor."), *and Va. State Bd. of Pharm. v. Va. Citizens Consumer Council,* 425 U.S. 748, 773–74, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976) (Burger, J., concurring) ("The Court notes that roughly 95% [o]f all prescriptions are filled with dosage units already prepared by the manufacturer and sold to the pharmacy in that form.... In dispensing these *prepackaged* items, the pharmacist performs largely a packaging rather than a compounding function of former times."), *with, e.g.,* 22 Tex. Admin. Code § 291.131(c)(2) (2012) (Tex. State Bd. of Pharm., Pharmacies Compounding Non-Sterile Preparations) (dictating that a pharmacist must review and approve the materials, equipment, and final product during the compounding process as well as ensure that all pharmacists and technicians

engaged in compounding possess the requisite education and experience).

Compounding prescription drugs requires an equal, if not greater, degree of professional judgment on the part of the pharmacist than does preparing preformed dosage units for distribution. Even so, the majority of claims brought under chapter 74 that name a pharmacist as a defendant have concerned the misfilling of a prescription or distribution of an incorrect drug, and courts have consistently held that these claims are in fact health care liability claims requiring an expert report under chapter 74. *See, e.g., Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186–87 (Tex. App.-Houston [14th Dist.] 2007, pet. denied) (holding plaintiff's expert report insufficient in misfilled prescription case); *HEB Grocery Co., L.L.P. v. Farenik*, 243 S.W.3d 171, 176–77 (Tex.App.-San Antonio 2007, no pet.) (affirming sufficiency of plaintiff's expert report in misfilled prescription case); *Randalls Food and Drugs, L.P. v. Kocurek*, No. 14–05–01184–CV, 2006 WL 2771872, at *2–3 (Tex.App.-Houston [14th Dist.] Sept. 28, 2006, no pet.) (mem.op.) (holding expert report insufficient as to causation in misfilled prescription case); *Ruiz v. Walgreen Co.*, 79 S.W.3d 235, 238 (Tex.App.Houston [14th Dist.] 2002, no pet.) (holding that TMLA applies in misfilled prescription case); *see also CVS Pharm., Inc. v. Ballard*, No. 01–12–00253–CV, 2012 WL 4742652, at *4–6 (Tex.App.-Houston [1st Dist.] Oct. 4, 2012, no pet.) (mem.op.) (holding expert report sufficient in claim against pharmacy for failing to recognize and correct dangerous drug overdose and for failing to fill prescription in accordance with Texas Pharmacy Practice Standards); *Gingrich v. Scarborough*, No. 09–09–00211–CV, 2010 WL 1711067, at *5–6 (Tex.App.-Beaumont Apr.29, 2010, no pet.) (mem.op.) (rejecting sufficiency of plaintiff's expert report for claim that pharmacist failed to recognize excessive prescription before filling and distributing prescription). Furthermore, in many of the cases listed above, the courts held that an expert report was required because the alleged negligence exceeded the ordinary knowledge of a layman and thus had to be measured against a standard of professional care. If claims pertaining to the misfilling of prescription drugs exceed the ordinary knowledge of a layman so as to require a chapter 74 expert report, it logically follows that allegations of negligence that occurred during the process of compounding a prescription drug ought to require a chapter 74 expert report as well.

Moreover, even claims against pharmacists that resemble products liability claims have been held to fall within the parameters of chapter 74. *See San Antonio Extended Med. Care, Inc. v. Vasquez*, 327 S.W.3d 193, 199–200 (Tex.App.-San Antonio 2010, no pet.) (op. on reh'g) (holding that chapter 74 expert report was required in case in which plaintiff alleged ordinary negligence against "prescription drug" firm that provided improperly filled oxygen tanks for plaintiff's ventilator). The Texas Supreme Court recently reversed part of a ruling that attempted to divide a claim against a pharmaceutical device provider into separate products liability and TMLA causes of action. *Turtle Healthcare Grp., L.L.C. v. Linan*, 337 S.W.3d 865, 869 (Tex.2011). The appellate court originally attempted to separate the claims that alleged a departure from accepted standards of medical care from those that merely alleged ordinarily negligence. *Turtle Healthcare Grp., L.L.C. v. Linan*, 338 S.W.3d 1, 9 (Tex.App.-Corpus Christi 2009) (Vela, J., dissenting) ("The Linans' claim is one for the breach of the standard of care for a health care provider because providing Linan with a functioning ventilator is inseparable from insuring that

the batteries, necessary for proper functioning of the ventilator, were properly charged."). The Supreme Court followed the reasoning of Justice Vela's dissent in its opinion, holding that even the pharmacy's duty to ensure that batteries were properly charged fell within the boundaries of the TMLA in that any claims of negligence regarding the improperly charged batteries must be judged against an accepted standard of professional care rather than ordinary care. *Turtle Healthcare Grp., L.L.C.*, 337 S.W.3d at 867–69.

Here, appellants engaged in a process much more complex than ensuring that oxygen tanks were fully filled or batteries fully charged at the time of delivery. Also, the process of compounding requires more professional judgment and discretion than the process of distributing preformed dosage units. To hold appellants' alleged negligence in compounding to a standard of ordinary care when other courts have measured even the duty to ensure that batteries are properly charged or preformed dosage prescriptions properly filled against an accepted standard of professional care would be counterintuitive to our primary goal of giving effect to the legislature's intent as expressed within the TMLA. *See* Tex. Gov't Code Ann. § 312.005 (West 2013) ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent."). The Texas Supreme Court has recognized the breadth of the TMLA's scope, and the interpretations of other courts listed above indicate how the courts have followed this trend specifically with respect to the TMLA as it pertains to pharmacists. *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176 (Tex.2012) ("We recognize that the Legislature intended the Texas Medical Liability Insurance Improvement Act (TMLIIA), the TMLA's predecessor, to be broad, and it broadened that scope further in 2003 with its repeal and amendments resulting in the TMLA."). We should not deviate from this trend by imposing even stricter requirements on classifying claims against pharmacists as health care liability claims than the legislature has explicitly included within the TMLA.

According to the majority's interpretation, the difference between holding a pharmacist liable under the TMLA or ordinary tort law could be whether a nurse or physician administered the drug as opposed to the pharmacist directly delivering the prescription to the patient. Such an interpretation is not only unduly strict and constraining, but it is also untenable insofar as it leads to an absurd result that diverges from the legislature's intent. *See Jennings v. WallBuilder Presentations, Inc. ex rel. Barton*, 378 S.W.3d 519, 523 (Tex.App.-Fort Worth 2012, no pet.) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010)). By compounding the lipoic acid, appellants engaged in one of the most time-honored aspects of the professional practice of pharmacy, one that antedates mass production and distribution of uniform pharmaceuticals and requires professional judgment, education, and aptitude.

## Conclusion

One of the primary purposes of the TMLA is to protect professionals from meritless negligence claims and to measure any alleged negligence against a professional standard. Respectfully, I believe the majority's interpretation would deny appellants the statutory protection of measuring their judgment against an acceptable standard of professional care. For these reasons, I dissent from the majority opinion and would reverse the trial court's denial of appellants' motion to dis-

miss for failure to file a chapter 74 expert report and remand the case to the trial court with instructions to dismiss appellee's claims against appellants and to consider whether to award reasonable attorney's fees. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 193.