

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00519-CV

RANDOL MILL PHARMACY; KVG
ENTERPRISES, INC.; GARY G.
DALEY; JOHN WAYNE BAILEY;
JAMES ROBERT FORSYTHE;
KEVIN LYNN HEIDE; JULIE
KNOWLTON LUBBERT; AND CARA
MORRELL

APPELLANTS

V.

STACEY MILLER AND RANDY
MILLER

APPELLEES

----------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY

----------

## DISSENTING OPINION

----------

I respectfully dissent from the majority's opinion because I believe that the claims urged by Stacey and Randy Miller are health care liability claims that require an expert's report under chapter 74. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2011). I further believe that the majority adopts an overly

strict interpretation of the Texas Medical Liability Act (TMLA) that both unnecessarily heightens the already rigorous statutory requirements pertaining to pharmacists and runs contrary to the trend of case law interpreting the TMLA.

The Texas Legislature, hoping to curtail the number of frivolous lawsuits and preemptively remedy an impending rise in health care costs, intensified the procedural requirements necessary to sustain a cause of action against a health care provider when it passed the TMLA. *See Scoresby v. Santillan*, 346 S.W.3d 546, 553–54 (Tex. 2011) ("Fundamentally, the goal of the [TMLA] has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims."). The statutory and procedural rigor of the TMLA ought to serve largely to *deter* frivolous lawsuits regarding health care, rather than compel or even encourage litigants to disguise health care liability claims and divert them into other areas of the law. *See id.* Although the TMLA heightened the procedural threshold for health care liability claims, it did not alter the substantive or underlying nature of these claims. *Omaha Healthcare Ctr., L.L.C. v. Johnson*, 344 S.W.3d 392, 394–95 (Tex. 2011) ("In order to determine whether a claim is [a health care liability claim], we consider the underlying nature of the claim. Artful pleading cannot alter that nature." (citation omitted)).

**The TMLA's Text**

The TMLA provides that a health care liability claim is

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or

2

professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13) (West Supp. 2012). The TMLA supplies a general definition for a "[h]ealth care provider" that includes a pharmacist and any employee, independent contractor, or agent of a pharmacist acting "in the course and scope of the employment or contractual relationship." *Id.* § 74.001(12)(A)(iv), (B)(ii). Additionally, the TMLA generally defines "[h]ealth care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(10). Despite these broad definitions, however, the TMLA significantly limits the scope of possible health care liability claims against pharmacists in a separate provision providing,

> "Pharmacist" means one licensed under Chapter 551, Occupations Code, who, for the purposes of this chapter, performs those activities limited to the dispensing of prescription medicines which result in health care liability claims and does not include any other cause of action that may exist at common law against them, including but not limited to causes of action for the sale of mishandled or defective products.

*Id.* § 74.001(22). Therefore, according to this stricter standard, a health care liability claim may be sustained only against a pharmacist who dispenses prescription medications that result in a health care liability claim.

The issue here hinges on whether appellants qualify as "health care providers" under the TMLA, which requires that they satisfy the TMLA's criterion

3

of "dispensing . . . prescription medications." The Texas Pharmacy Act (TPA) provides a technical definition for the term "dispense" as it pertains to pharmacists:

> "Dispense" means to prepare, package, compound, or label, in the course of professional practice, a prescription drug or device for delivery to an ultimate user or the user's agent under a practitioner's lawful order.

Tex. Occ. Code Ann. § 551.003(16) (West 2012).

Both the majority and appellees contend that appellants do not satisfy the "prescription drug" aspect of the TPA's definition of "dispense" because appellants did not provide the lipoic acid to Dr. Tan pursuant to an individual prescription for Stacey Miller. *See id.* The standards for "pharmacist" under the TMLA and "dispense" under the TPA, however, require merely a "prescription drug," *not* a drug specifically prescribed for a particular individual. *Id.*; Tex. Civ. Prac. & Rem. Code Ann. § 74.001(22). Appellees rely heavily on the report of the Texas Department of State Health Services to support their claim that there was no prescription for a *specific* patient. This very report concedes, however, that appellants were compounding "*prescription drugs*, such as: Lipoic Acid Injectable 200 mg/ml." [Emphasis added.] Furthermore, in addition to labeling the lipoic acid injections as a "prescription drug," the report also includes a report from the pharmacy's records of the prescriptions provided to Dr. Tan, which lists the date and time that appellants delivered the lipoic acid injections, assigns

4

each order a separate "Rx #," and notes the specifications and instructions for the lipoic acid to be dispensed.

The majority states that "Dr. Tan placed a 'bulk' telephone order with appellants on November 29, 2011 and on December 2, 2011 for an aggregate of twenty-three 30-millimeter vials of injectable lipoic acid for 'office use.'" An orally transmitted prescription order may be valid, though, provided that the pharmacist notes "the dispensing instructions of the practitioner" and "retain[s] the prescription for the period specified by law." Tex. Occ. Code Ann. § 562.004 (West 2012). The pharmacy's report clearly indicates that the pharmacist to whom Dr. Tan transmitted his order noted Dr. Tan's specifications for 200 mg/ml lipoic acid injections. Lastly, there is no requirement that compounding be performed strictly for an individual patient to be considered compounding rather than manufacturing. *See id.* §§ 562.152 ("A pharmacy may dispense and deliver a reasonable quantity of a compounded drug to a practitioner for office use by the practitioner in accordance with this chapter."), 551.003(23) ("'Manufacturing' means the production, preparation, propagation, conversion, or processing of a drug or device. . . . The term *does not include compounding.*" (emphasis added)), 551.003(9)(B) ("'Compounding' means the preparation, mixing, assembling, packaging, or labeling of a drug or device . . . for administration to a patient by a practitioner as the result of a practitioner's initiative.") (West 2012). Therefore, even though the record does not contain an individual prescription for Stacey

5

Miller, it does indicate that appellants compounded the lipoic acid injections pursuant to a prescription from Dr. Tan that is valid for TMLA purposes.

The second issue the majority raises regarding the definition of "dispense" concerns the phrase "delivery to an ultimate user." *Id.* § 551.003(16). The TPA defines "deliver" or "delivery" as "the actual, constructive, or attempted transfer of a prescription drug or device or controlled substance from one person to another, with or without consideration." *Id.* § 551.003(13). The TPA also defines an "ultimate user" as a "person who obtains or possesses a prescription drug or device for the person's own use or for the use of a member of the person's household." *Id.* § 551.003(43). The majority rests its ruling on these two definitions; however, other statutes provide further relevant guidance regarding the meaning of "dispense." For instance, the health and safety code also defines "dispense" in the context of regulating pharmaceutical practice; it provides,

> "Dispense" means the delivery of a controlled substance in the course of professional practice or research, by a practitioner or person acting under the lawful order of a practitioner, to an ultimate user or research subject. The term includes the prescribing, *administering*, packaging, labeling, or *compounding* necessary to prepare the substance for delivery.

Tex. Health & Safety Code Ann. § 481.002(12) (West 2010) (emphasis added). Therefore, according to this definition, the chain of events comprising dispensation would have included Dr. Tan's administering the lipoic acid to Stacey Miller as well as appellants' compounding of it. *See id.*; Tex. Occ. Code

6

Ann. § 551.003(1) (defining "administer" as the direct application of a prescription drug to the body of a patient, including by injection).

The majority construes the definition of "ultimate user" too narrowly, asserting that appellants did not fulfill the standard because they delivered the compounded lipoic acid to Dr. Tan, who did not use the drug on himself. This construction unnecessarily increases the already heightened standard imposed by the legislature; nowhere does the TMLA dictate the strict privity between a pharmacist and an ultimate user that the majority suggests. The majority's interpretation would deny the many pharmacists who compound drugs for individuals that must be administered by nurses or physicians, intravenously or otherwise, of the protections afforded to them by the TMLA simply because the pharmacist did not personally deliver the prescription to the recipient. Despite the TPA's more limited definition under the health and safety code, the administration of a drug to an ultimate user by a physician constitutes sufficient "delivery" that satisfies the definition of "dispense."

Therefore, a plain text interpretation of the TMLA and related statutes reveals that appellees did in fact state a TMLA claim against appellants. The record supports that the lipoic acid injections were in fact a "prescription medicine," despite not being prescribed for a particular individual. Furthermore, administration by a physician is a valid method of "delivery," so construing Stacey Miller as the "ultimate user" is not impermissible under related statutory text, even though she did not administer the injections to herself. *See* Tex. Health &

7

Safety Code Ann. § 481.002(12). Because the "prescription drug," injectable lipoic acid, was delivered to the "ultimate user," Stacey Miller, I believe this situation meets the TPA's definition of "dispense." *See* Tex. Occ. Code Ann. § 551.003(16). Therefore, since appellees essentially contend that appellants breached an accepted standard of health care when they compounded the lipoic acid and "dispens[ed] . . . [the] prescription medicine[ ]," appellees state a claim under the TMLA that is subject to chapter 74's expert report requirements. *See id.*; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351.

The majority conflates two separate elements of the statutory definition of "dispense." Essentially, the majority states that for a pharmacist to qualify as a health care provider under the TMLA, the pharmacist must dispense a prescription drug pursuant to an individual prescription for a specific patient; however, this theory unduly heightens the already strict standard pharmacists must satisfy to qualify as health care providers under the TMLA. The definition of "dispense" contains multiple distinct requirements: a pharmacist must (1) prepare, compound, or label, (2) in the course of professional practice, (3) a prescription drug (4) for delivery to an ultimate user or the ultimate user's agent (5) under a practitioner's lawful order. Tex. Occ. Code Ann. § 551.003(16) (defining "dispense"). The majority's interpretation construes the fourth and fifth requirements so as to create a more onerous requirement that a pharmacist may only prepare, compound, or package a prescription drug for an ultimate user pursuant to a practitioner's lawful prescription specifically for the ultimate user to

8

satisfy the definition of "dispense." *Id.* The statute clearly states, however, that a pharmacist need only compound a prescription drug pursuant to a practitioner's lawful *order* to satisfy the definition of "dispense." *See id.* The occupations code includes a distinct definition of "prescription drug order," defining a prescription drug order as "an order from a practitioner . . . to a pharmacist for a drug or device *to be dispensed*." *Id.* § 551.003(37)(A) (emphasis added). This definition, too, does not require that a prescription drug order be an order from a practitioner to a pharmacist for a drug to be dispensed pursuant to a prescription for a specific patient. As stated above, Dr. Tan's telephonic order to appellants for lipoic acid qualifies as a "practitioner's lawful order" as it pertains to the definition of "dispense," even though Dr. Tan did not order the lipoic acid exclusively as a prescription for Stacey Miller.

Thus, the final remaining issue is whether the criterion that the drug is delivered to an "ultimate user's agent" is satisfied. The majority concedes that a doctor or nurse administering a drug could serve as an "ultimate user's agent"; however, they qualify this concession by stating that a doctor or nurse is an "ultimate user's agent" under the definition of "dispense" only if the doctor or nurse administers a drug prescribed specifically for the "ultimate user." This creates another ancillary requirement not included within the statute. The definition of "ultimate user" requires only that a person "obtain[] or possess[] a prescription drug . . . for the person's own use"; this definition does not require that the ultimate user do so as the result of a specific and unique prescription,

9

and the definition of "dispense" requires only that the drug be delivered to the ultimate user under a practitioner's lawful order. *Id.* § 551.003(16), (43). The existence of a specific prescription does not alter the identity of the ultimate user or the nature of the agents who may administer the drug. Stacey Miller is the "ultimate user" of the prescription drug—lipoic acid—because she "obtain[ed]" and "possess[ed]" the prescription drug when her agent—Dr. Tan—delivered the drug to her by administering the injection. *Id.* § 551.003(43).

In sum, because the lipoic acid was compounded under Dr. Tan's lawful order and then delivered either actually to Stacey Miller's agent, Dr. Tan, or constructively to Stacey Miller herself by Dr. Tan, appellants did in fact "dispense" the lipoic acid, which qualifies them as health care providers under the TMLA. *Id.* §§ 551.003(13) (defining "delivery" as the "actual" or "constructive" transfer of a prescription drug), 551.003(16); Tex. Civ. Prac. & Rem. Code Ann. § 74.001(22).

**Interpretation of the TMLA**

The majority's interpretation also runs contrary to the case law interpreting the TMLA. In general, courts have construed the TMLA broadly, so as to include claims within the TMLA. *See, e.g.*, *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 853–54 (Tex. 2005) (holding that patient's claim against health care provider for assault by another patient was health care liability claim); *Covenant Health Sys. v. Barnett*, 342 S.W.3d 226, 233–34 (Tex. App.—Amarillo 2011, no pet.) (holding that allegations of improper monitoring of patient at free heart

10

screening test and placing of aerobic step for screening too close to wall constituted health care liability claim); *Scientific Image Ctr. Mgmt., Inc. v. Brewer*, 282 S.W.3d 233, 239–40 (Tex. App.—Dallas 2009, pet. denied) (holding that plaintiff's claims couched as claims under the Texas Deceptive Trade Practices-Consumer Protection Act for failed elective plastic surgery were in essence health care liability claims governed by chapter 74); *Clark v. TIRR Rehab. Ctr.*, 227 S.W.3d 256, 262–64 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that failure to supervise elderly woman attempting exercise during physical therapy was health care liability claim). This broad construction of the TMLA largely serves to further the legislature's intent that decisions requiring medical, health care, or otherwise professional judgment be weighed against accepted standards of professional care, thereby insulating medical and health care professionals from claims of ordinary negligence arising from the exercise of professional judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13) (defining health care liability claim as "a cause of action . . . [for a] claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care"); *see also Clark*, 227 S.W.3d at 262–64; *Oak Park, Inc. v. Harrison*, 206 S.W.3d 133, 139 (Tex. App.—Eastland 2006, no pet.) (holding that allowing  dangerous patient to remain in same room as another patient was governed by accepted standards of medical care, health care, and safety rather than by ordinary negligence).

The core rationale behind holding professionals to a professional standard of care and requiring a threshold expert report is that many of the elements of a medical negligence claim and the facts that underlie them transcend common knowledge. In most claims of medical negligence, an expert would be required eventually to prove causation or damages, so the threshold expert report requirement in chapter 74 seeks to eliminate meritless or medically unsustainable claims before they progress to further stages of litigation. *See Saleh v. Hollinger*, 335 S.W.3d 368, 374 (Tex. App.—Dallas 2011, pet. denied) ("In determining whether a claim is inseparable from the rendition of medical care, we consider factors such as whether a specialized standard in the health care community applies to the alleged circumstances and whether the alleged negligent act involved medical judgment related to the patient's care or treatment.") (citing *Diversicare*, 185 S.W.3d at 847–52); *see also Inst. For Women's Health, P.L.L.C. v. Imad*, No. 04-05-00555-CV, 2006 WL 334013, at *3 (Tex. App.—San Antonio Feb. 15, 2006, no pet.) (mem. op.) ("Expert testimony is necessary to establish the applicable standard of care 'when the alleged negligence is of such a nature as not to be within the experience of the layman.'") (quoting *FFE Transp. Serv., Inc v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004)).

The majority's construction of the TMLA leads to a result directly at odds with the legislature's intent. Not only does the majority's interpretation deny appellants the statutory protection of measuring their professional judgment against an accepted standard of professional care, it also exposes appellants to

12

greater liability by allowing appellees to couch an essentially health care based claim in terms of a product liability claim and circumvent the procedural standards of chapter 74. *See Omaha Healthcare Ctr., L.L.C.*, 344 S.W.3d at 394–95 (stating litigants cannot avoid the requirements of the TMLA by artfully pleading a health care liability claim and classifying the claim as a different cause of action).

Here, appellees allege their claims against appellants in terms of a products liability suit in which they assert that appellants compounded defective lipoic acid. Compounding is an integral aspect of the practice of pharmacy, however, such that it is part of the standard curriculum at most pharmacy schools. *See Med. Ctr. Pharm. v. Mukasey*, 536 F.3d 383, 387–88 (5th Cir. 2008) (citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 361, 122 S. Ct. 1497, 1500 (2002)). Although a significant portion of the professional practice of pharmacy has lapsed into the process of packaging and distributing premeasured dosage units provided by large-scale manufacturers for retail sale and distribution, the localized service of compounding prescription drugs nevertheless continues to require a pharmacist's professional judgment and skill. *Compare Tex. State Bd. of Pharm. v. Gibson's Disc. Ctr., Inc.*, 541 S.W.2d 884, 888 (Tex. App.—Austin 1976, writ ref'd n.r.e.) ("[I]t is a fair conclusion that the dispensing of prescription drugs has become more of a retail endeavor than a service endeavor."), *and Va. State Bd. of Pharm. v. Va. Citizens Consumer Council*, 425 U.S. 748, 773–74, 96 S. Ct. 1817, 1831 (1976) (Burger, J.,

concurring) ("The Court notes that roughly 95% [o]f all prescriptions are filled with dosage units already prepared by the manufacturer and sold to the pharmacy in that form. . . . In dispensing these *prepackaged* items, the pharmacist performs largely a packaging rather than a compounding function of former times."), *with, e.g.*, 22 Tex. Admin. Code § 291.131(c)(2) (2012) (Tex. State Bd. of Pharm., Pharmacies Compounding Non-Sterile Preparations) (dictating that a pharmacist must review and approve the materials, equipment, and final product during the compounding process as well as ensure that all pharmacists and technicians engaged in compounding possess the requisite education and experience).

Compounding prescription drugs requires an equal, if not greater, degree of professional judgment on the part of the pharmacist than does preparing preformed dosage units for distribution. Even so, the majority of claims brought under chapter 74 that name a pharmacist as a defendant have concerned the misfilling of a prescription or distribution of an incorrect drug, and courts have consistently held that these claims are in fact health care liability claims requiring an expert report under chapter 74. *See, e.g.*, *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186–87 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding plaintiff's expert report insufficient in misfilled prescription case); *HEB Grocery Co., L.L.P. v. Farenik*, 243 S.W.3d 171, 176–77 (Tex. App.—San Antonio 2007, no pet.) (affirming sufficiency of plaintiff's expert report in misfilled prescription case); *Randalls Food and Drugs, L.P. v. Kocurek*, No. 14-05-01184-CV, 2006 WL 2771872, at *2–3 (Tex. App.—Houston [14th Dist.] Sept. 28, 2006, no pet.)

14

(mem. op.) (holding expert report insufficient as to causation in misfilled prescription case); *Ruiz v. Walgreen Co.*, 79 S.W.3d 235, 238 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (holding that TMLA applies in misfilled prescription case); *see also CVS Pharm., Inc. v. Ballard*, No. 01-12-00253-CV, 2012 WL 4742652, at *4–6 (Tex. App.—Houston [1st Dist.] Oct. 4, 2012, no pet.) (mem. op.) (holding expert report sufficient in claim against pharmacy for failing to recognize and correct dangerous drug overdose and for failing to fill prescription in accordance with Texas Pharmacy Practice Standards); *Gingrich v. Scarborough*, No. 09-09-00211-CV, 2010 WL 1711067, at *5–6 (Tex. App.—Beaumont Apr. 29, 2010, no pet.) (mem. op) (rejecting sufficiency of plaintiff's expert report for claim that pharmacist failed to recognize excessive prescription before filling and distributing prescription).  Furthermore, in many of the cases listed above, the courts held that an expert report was required because the alleged negligence exceeded the ordinary knowledge of a layman and thus had to be measured against a standard of professional care.  If claims pertaining to the misfilling of prescription drugs exceed the ordinary knowledge of a layman so as to require a chapter 74 expert report, it logically follows that allegations of negligence that occurred during the process of compounding a prescription drug ought to require a chapter 74 expert report as well.

Moreover, even claims against pharmacists that resemble products liability claims have been held to fall within the parameters of chapter 74.  *See San Antonio Extended Med. Care, Inc. v. Vasquez*, 327 S.W.3d 193, 199–200 (Tex.

15

App.—San Antonio 2010, no pet.) (op. on reh'g) (holding that chapter 74 expert report was required in case in which plaintiff alleged ordinary negligence against "prescription drug" firm that provided improperly filled oxygen tanks for plaintiff's ventilator). The Texas Supreme Court recently reversed part of a ruling that attempted to divide a claim against a pharmaceutical device provider into separate products liability and TMLA causes of action. *Turtle Healthcare Grp., L.L.C. v. Linan*, 337 S.W.3d 865, 869 (Tex. 2011). The appellate court originally attempted to separate the claims that alleged a departure from accepted standards of medical care from those that merely alleged ordinarily negligence. *Turtle Healthcare Grp., L.L.C. v. Linan*, 338 S.W.3d 1, 9 (Tex. App.—Corpus Christi 2009) (Vela, J., dissenting) ("The Linans' claim is one for the breach of the standard of care for a health care provider because providing Linan with a functioning ventilator is inseparable from insuring that the batteries, necessary for proper functioning of the ventilator, were properly charged."). The Supreme Court followed the reasoning of Justice Vela's dissent in its opinion, holding that even the pharmacy's duty to ensure that batteries were properly charged fell within the boundaries of the TMLA in that any claims of negligence regarding the improperly charged batteries must be judged against an accepted standard of professional care rather than ordinary care. *Turtle Healthcare Grp., L.L.C.*, 337 S.W.3d at 867–69.

Here, appellants engaged in a process much more complex than ensuring that oxygen tanks were fully filled or batteries fully charged at the time of delivery.

16

Also, the process of compounding requires more professional judgment and discretion than the process of distributing preformed dosage units. To hold appellants' alleged negligence in compounding to a standard of ordinary care when other courts have measured even the duty to ensure that batteries are properly charged or preformed dosage prescriptions properly filled against an accepted standard of professional care would be counterintuitive to our primary goal of giving effect to the legislature's intent as expressed within the TMLA. *See* Tex. Gov't Code Ann. § 312.005 (West 2013) ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent."). The Texas Supreme Court has recognized the breadth of the TMLA's scope, and the interpretations of other courts listed above indicate how the courts have followed this trend specifically with respect to the TMLA as it pertains to pharmacists. *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 176 (Tex. 2012) ("We recognize that the Legislature intended the Texas Medical Liability Insurance Improvement Act (TMLIIA), the TMLA's predecessor, to be broad, and it broadened that scope further in 2003 with its repeal and amendments resulting in the TMLA."). We should not deviate from this trend by imposing even stricter requirements on classifying claims against pharmacists as health care liability claims than the legislature has explicitly included within the TMLA.

According to the majority's interpretation, the difference between holding a pharmacist liable under the TMLA or ordinary tort law could be whether a nurse or physician administered the drug as opposed to the pharmacist directly

17

delivering the prescription to the patient. Such an interpretation is not only unduly strict and constraining, but it is also untenable insofar as it leads to an absurd result that diverges from the legislature's intent. *See Jennings v. WallBuilder Presentations, Inc. ex rel. Barton*, 378 S.W.3d 519, 523 (Tex. App.— Fort Worth 2012, no pet.) (citing *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010)). By compounding the lipoic acid, appellants engaged in one of the most time-honored aspects of the professional practice of pharmacy, one that antedates mass production and distribution of uniform pharmaceuticals and requires professional judgment, education, and aptitude.

**Conclusion**

One of the primary purposes of the TMLA is to protect professionals from meritless negligence claims and to measure any alleged negligence against a professional standard. Respectfully, I believe the majority's interpretation would deny appellants the statutory protection of measuring their judgment against an acceptable standard of professional care. For these reasons, I dissent from the majority opinion and would reverse the trial court's denial of appellants' motion to dismiss for failure to file a chapter 74 expert report and remand the case to the trial court with instructions to dismiss appellee's claims against appellants and to

consider whether to award reasonable attorney's fees. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 193.

                                        TERRIE LIVINGSTON
                                        CHIEF JUSTICE

DELIVERED: September 19, 2013